**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

FOODWORKS USA, INC.,

      Plaintiff,

      v.

FOODWORKS OF ARLINGTON
HEIGHTS, LLC,

      Defendant.

No. 10 C 1020

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Defendant has filed a Motion for Default Judgment. Defendant requests that the Court enter a default judgment against Plaintiff and in favor of Defendant on its counterclaim and award Defendant its attorneys' fees and costs. For the reasons stated below, the Motion is granted in part.

## I. BACKGROUND

Defendant Foodworks of Arlington Heights, LLC (FWAH), operates a Mexican-themed restaurant in Arlington Heights, Illinois, known as the Fuego Mexican Grill and Margarita Bar (Fuego). Plaintiff Foodworks USA, Inc.'s (FUSA's) Complaint and Defendant's Counterclaim deal with intellectual property issues relative to the name of the restaurant and the trade dress used at the restaurant. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28

U.S.C. § 636(c). The tortured history of this case is well known to the parties, but because the chronology is relevant to the instant Motion, the Court will revisit it.[1]

## A. The Complaint and Counterclaim

Plaintiff filed its Complaint on February 15, 2010. The Complaint alleges trademark infringement, trade dress infringement, unfair competition, dilution of trademark, dilution of trade dress, deceptive trade practices, and breach of contract.

The gravamen of the Complaint is that from January 2005 through January 2010, Defendant operated Fuego under a license agreement and management agreement with Plaintiff, pursuant to which Plaintiff provided consulting services and Defendant was granted a nonexclusive license to use Plaintiff's registered servicemark, "Fuego Mexican Grill and Margarita Bar" to market and promote its restaurant business. (Compl. 1–2 & ¶ 10). In September and October 2009, the management and license agreements were terminated, but Defendant continued to operate a restaurant at the same location, using the same servicemark and the same trade dress, without interruption in service. (*Id.* 2; *see* ¶¶ 12–17). In January 2010, after Plaintiff served Defendant with a cease and desist letter, Defendant renamed the restaurant Cocina Fuerte and made minimal changes to exterior and interior signage, but otherwise continued operating the restaurant in the same manner. (*Id.* 2, ¶¶ 18–31).

---

[1] Additional factual background is laid out in the Court's August 14 and December 3, 2012 Orders. (Dkt. 94, 122).

Defendant filed its Answer and Counterclaim on April 19, 2010. The Counterclaim also alleges trademark infringement, trade dress infringement, unfair competition, dilution of trademark, and dilution of trade dress. In addition, the Counterclaim alleges fraudulent or false representation and conversion, and requests a declaratory judgment. Not surprisingly, the Counterclaim describes a different scenario from the Complaint. The Counterclaim asserts that Defendant's shareholders, which included Ayad Nahlawi, Plaintiff's principal owner, were responsible for developing the service mark and trade dress for the Fuego restaurant. (Counterclaim ¶¶ 14, 18–22, 24). An August 2004 operating agreement indicated that Nahlawi would be the manager of both Defendant and the restaurant, but said nothing about the restaurant operating under any form of an intellectual property license. (*Id.* ¶ 16). Nahlawi presented Defendant's shareholders with a different operating agreement in June 2005, which included some key differences. (*Id.* ¶ 23). For example, the new operating agreement stated that the restaurant was operating under the name Fuego pursuant to a license agreement with Plaintiff, but no such license agreement existed, no shareholder had ever heard of Plaintiff, and no shareholders had contemplated the name Fuego or the Fuego logo as belonging to any other entity besides Defendant. (*Id.* ¶ 24). The restaurant opened in November 2014. (*Id.* ¶ 25).

In October 2006, Nahlawi circulated various documents to Defendant's shareholders, including a license agreement and a management agreement. (Counterclaim ¶ 26). The documents indicated for the first time that a company known as

Foodworks Management, Inc. (FMI), primarily owned by Nahlawi, was Fuego's general manager. (*Id.* ¶ 27). The documents indicated that they were approved by Defendant's shareholders on October 30, 2006 (*id.* Exs. F, G), but they were never approved by a majority of members (*id.* ¶ 27). Nevertheless, sometime after October 30, Nahlawi unilaterally executed these documents as Defendant's manager, without the requisite approval of Defendant's shareholders. (*Id.* ¶¶ 27–28). In September 2009, a majority of Defendant's shareholders voted to oust Nahlawi as manager of the LLC, remove FMI as the general manager of Fuego, and wrestle back control of their company from Nahlawi. (*Id.* ¶ 33). In December 2009, Defendant issued a cease and desist letter to Plaintiff, demanding that Plaintiff cease using the Fuego name and the associated intellectual property rights of "Fuego." (*Id.*).

## B. The Complaint is Dismissed for Failure to Prosecute

On March 21, 2011, Plaintiff's counsel filed a Motion to Withdraw. (Dkt. 39). On April 6, 2011, the Court granted the motion and continued the matter so that Plaintiff could obtain new counsel. (Dkt. 41, 44). On May 18, 2011, Nahlawi personally appeared and advised the Court that Plaintiff had not yet obtained new counsel. (Dkt. 43). Plaintiff was given until July 13, 2011, to retain new counsel and admonished that if it failed to do so its claims could be subject to involuntary dismissal and Defendant's claims given a default judgment. (*Id.)*.

On July 12, 2011, Defendant filed a Motion to Dismiss for Want of Prosecution and a Motion for Default Judgment. (Dkt. 46, 47). On July 13, 2011, Nahlawi again appeared without counsel. (Dkt. 49). Over Defendant's objections, both pending mo-

tions were entered and continued until August 9, 2011. (*Id.*). On August 8, 2011, over four months after Plaintiff's counsel was granted leave to withdraw, new counsel sought leave to appear on behalf of Plaintiff, which was granted. (Dkt. 51, 53). In light of Plaintiff's newly retained counsel, the Court struck Defendant's motion to dismiss and motion for default judgment. (Dkt. 55).

Plaintiff was first served with discovery requests in June 2010. (Dkt. 85 at ¶ 8, Exs. A–D). Over the subsequent *23 months*, Plaintiff ignored deadlines to respond to Defendant's discovery despite the Court granting several extensions, Defendant filing a motion to compel, and Plaintiff's counsel assuring the Court that responses were forthcoming. (Dkt. 66, 67, 72, 78, 79, 81, 82, 85 at ¶ 10). Finally, in late April and early May 2012, Plaintiff sent two email messages and a CD containing documents that were purportedly responsive to Defendant's discovery requests. (Dkt. 85 at ¶ 20, Exs. F–H).

The discovery responses were grossly deficient. While the interrogatories were responded to without objections, the responses contained practically none of the facts and details requested. (Dkt. 85 at ¶¶ 27–35, Ex. G). For example, Plaintiff's interrogatory responses, unsigned in violation of Rule 33, provided *no information* about the trademark and trade dress Defendant is alleged to have infringed. (*Id.* ¶¶ 30–33, Ex. G). Further, Plaintiff's document production consisted *entirely* of *Defendant's* financial records. (*Id.* ¶¶ 37–38, Exs. F, I).

On June 5, 2012, Defendant filed a Motion for Voluntary Dismissal for Failure to Prosecute, for Sanctions, and Other Relief. (Dkt. 85). Despite being granted two ex-

tensions, Plaintiff failed to respond to Defendant's motion. (Dkt. 84, 87, 89, 91). The final due date passed with no response or request for additional time.

On August 14, 2012, the Court granted Defendant's motion in part. (Dkt. 94). The Court found that Plaintiff and its counsel failed to comply with Court orders and Court-imposed deadlines. The Court concluded that Plaintiff never had a serious intention to prosecute this case, which wasted the Court's time and clogged the Court's calendar. The Court also found that Defendant was prejudiced by Plaintiff's dilatory conduct; Defendant had to file several motions and attend many status hearings in an unsuccessful effort to get Plaintiff to respond to discovery requests that were first served in *June 2010*. Moreover, the Court found that the merits of Plaintiff's case were seriously in doubt—Ayad Nahlawi, Plaintiff's principal owner and Defendant's former manager, surely must be in possession and control of relevant information relating to the trademark and trade dress claims that form the basis for Plaintiff's lawsuit. Yet, after numerous delays and missed deadlines, Plaintiff produced little, if any, information that supported its claims. Further, Plaintiff received "due warning" that its case was subject to dismissal. In sum, the Court found that the balance of factors governing dismissal under Rule 41(b) clearly favored dismissal for failure to prosecute and dismissed Plaintiff's complaint with prejudice. The Court, however, denied Defendant's request for a default judgment against Plaintiff on Defendant's Counterclaim.

## C. The Parties File Motions for Reconsideration

Each party filed a motion to reconsider the August 14, 2012 Order. In Defendant's motion, it sought to reconsider the Court's denial of Defendant's request for a default judgment against Plaintiff on Defendant's Counterclaim. (Dkt. 97). Despite being granted an extension (Dkt. 117), Plaintiff did not respond to Defendant's motion for reconsideration. Instead, Plaintiff filed its own motion to reconsider. (Dkt. 109). In Plaintiff's motion, it asserted that the Court did not have a full record and requested the opportunity to present its opposition to Defendant's Motion for Involuntary Dismissal.

The Court issued its ruling on December 3, 2012. (Dkt. 122). With regard to Plaintiff's Motion to Reconsider, Plaintiff neither identified any newly discovered evidence, nor did it argue that any manifest error of law or fact was committed. Moreover, Plaintiff provided *no evidentiary support* for its contention that counsel's "personal and professional difficulties" and "health issues suffered by Nahlawi and the family/personal issues being dealt with by him . . . during this same period" should be considered by the Court. And Plaintiff did not explain why these "difficulties"—if they prevented Plaintiff from vigorously prosecuting its case—were never brought previously to the Court's attention. To the contrary, Plaintiff's counsel, after he was retained in August 2011, repeatedly assured the Court that his client's responses to Defendant's discovery requests, as well as serving Plaintiff's own discovery requests, were forthcoming. Further, Plaintiff did not provide any support for its statement that it has "meritorious and valid claims that are part of this pro-

ceeding." Plaintiff has had sufficient opportunity to present its case and has failed to do so. And the purported existence of a meritorious case does not explain away Plaintiff's utter disregard for the Court's orders and schedules. The Court has conducted numerous status hearings only to listen to Plaintiff's excuses for why it could not meet the Court's deadlines and schedules. Plaintiff has not demonstrated that it had good cause for its failure to follow the Court's orders and schedules and regardless of whether it had a meritorious case, it failed to present its case in a timely manner. The Court denied Plaintiff's Motion to Reconsider.

The Court also denied Defendant's motion to reconsider the Court's denial of Defendant's request for a default judgment on Defendant's Counterclaim. In doing so, the Court gave Plaintiff "a *final* opportunity to *fully* respond to the interrogatories and requests to produce that were first served on June 16, 2010." (Dkt. 122 at 10) (emphasis in original). The Court gave Plaintiff 30 days, until January 2, 2013, to respond to the outstanding discovery and admonished Plaintiff that "[n]o further extensions will be granted." (*Id.* 11). Nevertheless, Plaintiff requested a two-day extension, until January 4, 2013, to complete discovery, which the Court granted. (Dkt. 123, 128). Finally, on January 8, 2013, Plaintiff served Defendant with revised interrogatory responses. (Dkt. 135, Ex. A).

## D. Defendant Files a Motion for Default Judgment

On January 11, 2013, Defendant filed the present Motion for Default Judgment. (Dkt. 135). Defendant contends that the revised interrogatory responses are deficient, containing "the same objectionable, non-responsive, lack of detail that the

Court had already admonished FUSA for producing in the first place." (Dkt. 140 at 5). Defendant also asserts that none of the other required tasks ordered by the Court were completed. (Dkt. 135 at ¶¶ 5–6). Thereafter, on January 13, 2013, Plaintiff mailed its Response to the Request to Produce, purporting to include supplemental documents and information. (Dkt. 148 at ¶¶ 5–6; Dkt. 146 at ¶¶ 1–2). However, the "supplemental" response merely referenced documents previously produced. (Dkt. 148 at ¶ 6; Dkt. 146 at ¶ 3).

On January 14, 2013, the Court set a briefing schedule on the Motion for Default Judgment. (Dkt. 137). Defendant's memorandum in support of its motion was due January 22, 2013, Plaintiff's response was due February 5, 2013, and Defendant's reply was due February 12, 2013. (*Id.*). On January 22, 2013, Defendant filed its memorandum. (Dkt. 140). A week after Plaintiff's response was due, it filed a request for a two-week extension, which the Court granted. (Dkt. 143, 145). On February 19, 2013, Plaintiff filed its response. Defendant filed its reply on February 26, 2013.

## E. Plaintiff Files an Appeal

In the meantime, Plaintiff filed an appeal in the Seventh Circuit from the Court's Orders of August 14 and December 3, 2012, dismissing its case. *Foodworks USA, Inc. v. Foodworks of Arlington Heights, LLC*, No. 13-1022 (7th Cir. filed Jan. 3, 2013). On January 7, 2013, the Court of Appeals ordered Plaintiff to file a memorandum by January 22, 2013, stating why its appeal should not be dismissed for lack of jurisdiction. On January 30, 2013, the Court of Appeals issued a rule to show

cause for Plaintiff's counsel's failure to respond to the January 7 Order and admonished Plaintiff that any failure to respond by February 6, 2013, could result in monetary or disciplinary sanctions. On February 27, 2013, three weeks overdue, Plaintiff's counsel responded to the rule to show cause, stating that he was still researching the jurisdictional issue. On March 4, 2013, the Court of Appeals ordered counsel to file a memorandum by March 11, 2013, or a motion to dismiss appeal pursuant to Federal Rule of Appellate Procedure 42(b). When no memorandum was filed by March 21, 2013, the Court of Appeals *sua sponte* gave counsel until Mach 29, 2013, to file his memorandum, again admonishing Plaintiff's counsel that a failure could result in monetary or disciplinary sanctions. On March 29, 2013, Plaintiff responded, requesting the Court of Appeals to drop its rule to show cause and allow Plaintiff to voluntarily dismiss its appeal. On April 1, 2013, the Court of Appeals ordered Plaintiff to file its motion to dismiss before April 8, 2013. When no motion was filed by April 23, 2013, the Court of Appeals issued an order to show cause for Plaintiff's counsel's failure to file his Rule 42(b) motion, again admonishing him that a failure to respond by April 30, 2013, could result in monetary or disciplinary sanctions. On May 10, 2013, ten days overdue, Plaintiff filed its motion to dismiss the appeal pursuant to Rule 42(b), which the Court of Appeals granted on the same day.

## II. DISCUSSION

### A. Applicable Law

The Federal Rules grant the district court with discretionary authority to impose appropriate sanctions for violations of discovery orders. Fed. R. Civ. P. 37(b)(2)(A);

*see e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 642 (7th Cir. 2011) ("[D]istrict courts have wide latitude in fashioning appropriate sanctions.") (citation omitted). The Supreme Court has explicitly stated that sanctions may be appropriate where the noncomplying party acted *either* with wilfulness, bad faith *or* fault. *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 640 (1976) (per curiam). "'Bad faith,' . . . is characterized by conduct which is either intentional or in reckless disregard of a party's obligations to comply with a court order." *Marrocco v. Gen'l Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992). "'Fault,' by contrast, doesn't speak to the noncomplying party's disposition at all, but rather only describes the reasonableness of the conduct—or lack thereof—which eventually culminated in the violation." *Id.* "Fault," however, is more than "a mere mistake or slight error in judgment;" instead, it "suggests objectively unreasonable behavior." *Long v. Steepro*, 213 F.3d 983, 987 (7th Cir. 2000); *see e360 Insight*, 658 F.3d at 642–43 (observing that negligence is sufficient fault for imposing sanctions).

The Court also has the inherent authority to sanction a party. The court's inherent authority is based on the court's power "to control the judicial process and litigation," *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 517 (D. Md. 2010) (citation omitted), a power which is necessary "to fashion an appropriate sanction for conduct which abuses the judicial process," *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991); *see Barnhill*, 11 F.3d at 1367. This authority "is based on the Court's power to manage and ensure the expeditious resolution of cases on their dockets and is not limited to discovery violations." *Larson v. Bank One Corp.*, No. 00

C 2100, 2005 WL 4652509, at *8 (N.D. Ill. Aug. 18, 2005). Thus, "[j]udges have inherent authority to impose sanctions for misconduct by litigants, their lawyers, witnesses, and others who participate in a lawsuit over which the judge is presiding." *S.E.C. v. First Choice Mgmt. Servs., Inc.*, 678 F.3d 538, 543 (7th Cir. 2012). "The policy underlying this inherent power of the courts is the need to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 465 (S.D.N.Y. 2010) (citation omitted). The Court need not determine whether it is exercising its statutory or inherent authority. "Under either Rule 37 or under the Court's inherent authority, the analysis for imposing sanctions is essentially the same." *Larson*, 2005 WL 4652509, at *8; *accord Danis v. USN Commc'ns, Inc.*, No. 98 C 7482, 2000 WL 1694325, at *30 (N.D. Ill. Oct. 23, 2000).

Whether under Rule 37 or the court's inherent authority, the party seeking sanctions must demonstrate that it was prejudiced by the discovery violation. *Marrocco*, 966 F.2d at 224. In evaluating the proposed sanction, the district court must determine if "fashion[ing] a lesser sanction . . . would adequately protect the interests of the [requesting party] while permitting [the noncomplying party] an opportunity to present its defense." *Marrocco*, 966 F.2d at 224. To determine an appropriate sanction, the court must "look to the entire procedural history of the case." *Long*, 213 F.3d at 986. "In other words, we weigh not only the straw that finally broke the

camel's back, but all the straws that the recalcitrant party piled on over the course of the lawsuit." *e360 Insight*, 658 F.3d at 643.

Rule 37 of the Federal Rules of Civil Procedure specifically authorizes courts to issue a default judgment against a party who fails to obey a discovery order. Fed. R. Civ. P. 37(b)(2)(A)(vi). Moreover, the inherent power of federal courts "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases" encompasses "the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 43–45. While a district court's choice of sanction for discovery violations is reviewed for abuse of discretion, when default judgment is contemplated, the court must be guided by a measure of restraint. *Barnhill v. United States*, 11 F.3d 1360, 1366 (7th Cir. 1993). "[W]hen a court enters a default judgment as a discovery violation, the court must find that the party against whom sanctions are imposed displayed wilfulness, bad faith or fault." *Aura Lamp & Lighting, Inc. v. Int'l Trading Corp.*, 325 F.3d 903, 909 (7th Cir. 2003). Further, when contemplating a default judgment sanction, the court should "consider the egregiousness of the conduct in question in relation to all aspects of the judicial process." *Barnhill*, 11 F.3d at 1367–68. Thus, while a default judgment is considered "draconian," it is warranted "when there is a clear record of delay or contumacious conduct, or when other, less drastic sanctions have proven unavailing." *Maynard v. Nygren*, 332 F.3d 462, 468 (7th Cir. 2003); *see Marrocco*, 966 F.2d at 224 (Default judgment "should usually be employed only in extreme situations, where

there is clear record of delay or *contumacious conduct*, or when other less drastic sanctions have proven unavailable.") (citation omitted) (emphasis in original).

## B. Analysis

Defendant moves for default judgment on its Counterclaim for Rule 37 discovery violations by Plaintiff. (Dkt. 135 at ¶ 8; Dkt. 140 at 1). Defendant asserts that although Plaintiff was given a final opportunity to comply with discovery orders and deadlines, it failed to do so. (Dkt. 135 at ¶¶ 2–6; Dkt. 140 at 2, 4–5, 8). Defendant also requests payment of fees both as a sanction for not responding to discovery and as the prevailing party under the Lanham Act. (Dkt. 135 at 3; Dkt. 140 at 5–6). Finally, Defendant contends it is entitled to punitive damages under its state law conversion claim. (Dkt. 140 at 7–8). In its response, Plaintiff argues that because its discovery responses are adequate, the motion should be denied. (Dkt. 146 at ¶¶ 1–3, 6, 9).

### 1. *Plaintiff's Discovery Responses are Grossly Deficient*

In dismissing Plaintiff's complaint for failure to prosecute in August 2012, the Court declined to grant Defendant a default judgment on its Counterclaim. Instead, the Court elected to give Plaintiff "a *final* opportunity to *fully* respond to the interrogatories and requests to produce that were first served on June 16, 2010." (Dkt. 122 at 10) (emphasis in original). Specifically, the Court ordered Plaintiff to:

> 1.  Revise its interrogatory responses, without objections, providing all facts and detail requested. For example, in responding to interrogatories 2 and 3, Plaintiff shall describe in *detail* the subject matter knowledge of each person identified. In responding to interrogatory 9, Plaintiff shall describe in *detail* all the steps that Plaintiff took "over a period of nearly 20 years" to develop the trade dress at issue. In re-

sponding to interrogatories 10, 11 and 12, Plaintiff shall describe in *detail* how third parties helped *Plaintiff* (not Defendant) develop the trade mark and trade dress at issue. In responding to interrogatory 16, Plaintiff shall describe in *detail* the license agreement with Foodworks 2047, including producing a copy of the agreement. In responding to interrogatory 18, Plaintiff shall describe in *detail* the information about who spent promotional dollars, including identifying the person(s) involved. In responding to interrogatory 19, Plaintiff shall describe in *detail* the royalty payments received by Plaintiff from Defendant during the relevant time period. All other interrogatory responses shall be similarly revised to provide the level of detail requested.

2. Serve Defendant with a signed and verified copy of the revised interrogatory responses as required by Rule 33.

3. Serve Defendant with a written response to the request to produce, without objections.

4. Supplement its production to provide Defendant with all relevant documents and information in its possession, custody or control that responds to the request to produce.

5. Provide Defendant with a signed affidavit describing the efforts it took to locate responsive documents or information.

6. Serve discovery requests, if any, on Defendant that relate to Defendant's Counterclaim.

(*Id.* 10–11) (emphasis in original). Despite the Court's final warning, Plaintiff failed to fully comply with the Court's Order and its discovery obligations.

While Plaintiff's amended responses include some longer explanations, they generally contain no more substance than the original responses that the Court found insufficient. For example, in responding to interrogatories 10, 11, and 12, the Court ordered Plaintiff to "describe in *detail* how third parties helped *Plaintiff* (not Defendant) develop the trade mark and trade dress at issue." (Dkt. 122 at 10) (emphasis in original). In its amended responses, however, Plaintiff provides vague, equivocal answers: "Any payments [for the development of the Fuego restaurant] not made

by [Defendant] would have been made by [Plaintiff];" and "All information concerning dates of service and amounts of payment [for the development of the interior and exterior space of Fuego] are contained in the books and records of [Defendant] and/or Plaintiff]." (Dkt. 140 Ex. D at 7). And, despite asserting that "[a]t all times, [the finish carpenter at Fuego] was supervised, overseen and directed by Nahlawi", Plaintiff contends that all records are held by Defendant and fails to provide the "date, time, location, and participants of each step [in the development of the trade dress and logo]" as requested by interrogatory 11. (*Id.* 7–8). Similarly, in its amended response to interrogatory 12, Plaintiff asserts that "the development of the Fuego dress cannot be linked to anyone other than Nahlawi over a period of 20 years," but fails to provide the details requested, "including the date, time, location, and participants at each step." (*Id.* 8).

Plaintiff also fails to provide the dates, times, locations, and participants requested in interrogatories 7, 8, and 9. (Dkt. 140 Ex. D at 5–6). Instead, Plaintiff asserts that "[i]t is impossible to identify, by date, time and location, any individual or particular steps taken by [Plaintiff] to develop the Fuego dress" over a period of 20 years. (*Id.* 6). While it may be impossible to identify *all* occasions when the trade dress was developed, it is not credible for Plaintiff to be unable to identify *any* occasions. Other insufficient responses include:

- Interrogatory 13 requests specific dates, but Plaintiff merely asserts "many occasions"
- Interrogatory 15 requests "all facts and circumstances," but none are provided

- In responding to interrogatory 18, Plaintiff asserts that Nahlawi and Plaintiff spent at least some of the monies on promotional materials but contends it has no records

- In responding to interrogatory 19, Plaintiff incredibly asserts that it has no records of the royalty payments it has received from Defendant

- Interrogatory 20 requests specific dates for when Defendant's members knew that the trade dress was owned by Plaintiff, but Plaintiff merely asserts "numerous meetings, discussions and conversations"

- Interrogatories 21 and 22 request specific dates for when Defendant's members became aware of Plaintiff's trademark infringement lawsuits, but Plaintiff merely asserts "all members . . . were aware of the [lawsuits] as it was a common topic of discussion"

(*Id.* 8–13).

Even if Plaintiff did not know any of this information before filing its Complaint, which is arguably a Rule 11 violation, it has had over three years to provide unequivocal answers to these requests. Moreover, Plaintiff failed to provide the Court-ordered affidavit, "describing the efforts it took to locate responsive documents or information." (Dkt. 122 at 11). Mere assertions by *counsel* that "Plaintiff continues to search out additional materials and documents that are in any way responsive to Defendant's discovery requests, ever mindful of its duty and obligation to supplement its discovery responses" (Dkt. 146 at ¶ 4), are not sufficient, especially three years after discovery was first served.

Plaintiff's response to Defendant's document request is similarly deficient. Not only did Plaintiff serve its response nine days late, it included no supplemental documents or information. (Dkt. 146 Ex. E; Dkt. 148 at ¶ 5, Ex. A). Instead, Plaintiff merely referred Defendant to the paucity of documents previously produced (Dkt.

146 at ¶ 3), which the Court found in August 2012 to be insufficient (Dkt. 94 at 8).[2]

Plaintiff is unable to produce documents for basic items that would support *Plaintiff's* claims. (Dkt. 146 Ex. E). For examples, Plaintiff has no documents relating to:

- The formation and ownership of *Plaintiff's* business, Foodworks USA
- The development, implementation, and licensing of the trade dress and trademark that *Plaintiff* placed at issue
- Payments received by *Plaintiff* for licensing
- State court cases filed by *Plaintiff* alleging similar trademark and trade dress violations
- The Right of First Refusal, attached to *Plaintiff's* Answer to Defendant's Counterclaim, which *Plaintiff* asserts granted it the right to use the Fuego marks and trade dress during the period of January 2005 through January 2010

(*Id.*; *see* Dkt. 22 at 35 & Ex. 1). These "responses" reinforce the Court's previous findings that "Plaintiff has never had a serious intention to prosecute this case" (Dkt. 94 at 9–10), and has no ability or intention to defend against the Counterclaim.

### 2. Plaintiff's Failure to Adequately Respond to Discovery and Comply with Court Orders Demonstrates Bad Faith and Fault

Plaintiff's failure to adequately respond to discovery requests and diligently comply with the Court's December 3, 2012 Order is part of a long pattern of egregious and contumacious behavior in this case. As described more fully above, Plaintiff was first served with discovery requests *three years* ago, in June 2010. (Dkt. 85

---

[2] Curiously, Plaintiff attached some "new" documents to its motion response (Dkt. 146 Exs. A–D), but makes no effort to explain why these documents have never been produced in discovery. In any event, Exhibits A–C are not "new," having been attached to *Defendant's* Counterclaim. (*Compare* Dkt. 146 Exs. A–C *with* Dkt. 20 Exs. E–G). And while Exhibit D purports to demonstrate Plaintiff's ownership of the intellectual property at issue, the document was executed only by a minority of Defendant's members. (*Id.* Exs. A, D).

at ¶ 8, Exs. A–D). Over the subsequent months, Plaintiff ignored numerous deadlines to respond to the discovery, despite the Court granting several extensions, Defendant filing a motion to compel, and Plaintiff's counsel assuring the Court that responses were forthcoming. (Dkt. 66, 67, 72, 78, 79, 81, 82, 85 at ¶ 10). And when Plaintiff finally responded, its responses were grossly deficient. (*See* Dkt. 94 at 8).

Plaintiff's dilatory conduct with respect to discovery is but one example of its egregious and contumacious behavior. In considering a default judgment motion, the Court must "consider the egregiousness of the conduct in question," *Barnhill*, 11 F.3d at 1368, and "weigh not only the straw that finally broke the camel's back, but all the straws that the recalcitrant party piled on over the course of the lawsuit," *e360 Insight*, 658 F.3d at 643. On June 5, 2012, Defendant filed a Motion for Voluntary Dismissal for Failure to Prosecute, for Sanctions, and Other Relief. (Dkt. 85). Despite being granted two extensions, Plaintiff failed to respond to Defendant's motion. On August 14, 2012, the Court granted Defendant's motion in part. (Dkt. 94). Each party filed a motion to reconsider. Defendant asked the Court to reconsider its denial of Defendant's requests for a default judgment on its Counterclaim. (Dkt. 97). Despite being granted an extension, Plaintiff did not respond to Defendant's motion. In its own motion for reconsideration, Plaintiff provided no evidentiary support for its contention that counsel's "personal and professional difficulties" and "health issues suffered by Nahlawi and the family/personal issues being dealt with by him . . . during this same period" should be considered by the Court. And Plaintiff did not explain why these "difficulties"—if they prevented Plaintiff from

vigorously prosecuting its case—were never brought previously to the Court's attention. Further, Plaintiff did not provide any support for its statement that it has "meritorious and valid claims that are part of this proceeding."

On January 11, 2013, Defendant filed the instant Motion for Default Judgment. (Dkt. 135). On January 14, 2013, the Court set a briefing schedule, which required Plaintiff to file its response by February 5, 2013. (Dkt. 137). Not surprisingly, Plaintiff missed this deadline completely; instead, a week after its response was due, Plaintiff filed a request for a two-week extension, which the Court granted. (Dkt. 143, 145). Moreover, despite the Court's explicit admonishment to include a complete discussion of points and authorities, including citations to all relevant authority (Dkt. 137), Plaintiff's response includes absolutely *no* citations to *any* legal authority. Instead, Plaintiff attempts to obfuscate the sanctions issue by arguing the merits of its case. (Dkt. 146). But, as this Court has previously warned Plaintiff, "the purported existence of a meritorious case does not explain away Plaintiff's utter disregard for the Court's orders and schedules." (Dkt. 122 at 8).[3]

Plaintiff's long pattern of failing to meet deadlines, to prosecute its case, and to adequately respond to discovery demonstrates both bad faith and fault. While Plaintiff's three years of dilatory conduct and utter disregard of the Court's orders may not evince willful or intentional behavior, it certainly demonstrates a reckless

---

[3] In the meantime, on January 3, 2013, Plaintiff filed an appeal in the Seventh Circuit from the Court's Orders of August 14 and December 3, 2012. Plaintiff's flagrant disregard for court-imposed deadlines continued. Over the subsequent four months, Plaintiff failed to meet five deadlines set by the Seventh Circuit and failed to respond timely to two orders to show cause.

disregard of Plaintiff's obligations to comply with court orders. *See Marrocco*, 966 F.2d at 224 (" 'Bad faith,' . . . is characterized by conduct which is either intentional or in reckless disregard of a party's obligations to comply with a court order."). Moreover, Plaintiff's repeated failures to meet deadlines and comply adequately with discovery requests—despite numerous warnings by the Court—demonstrates objectively unreasonable behavior. *See id.* (" 'Fault,' by contrast, doesn't speak to the noncomplying party's disposition at all, but rather only describes the reasonableness of the conduct—or lack thereof—which eventually culminated in the violation.").

As this Court has previously found, Defendant has been clearly prejudiced by Plaintiff's contumacious conduct. Defendant has had to file numerous motions and attend many status hearings in an unsuccessful attempt to get Plaintiff to participate in this litigation, which it initiated. After numerous delays and missed deadlines, Plaintiff has still produced little, if any, information that undermines Defendant's Counterclaim.

Moreover, Plaintiff has received numerous warnings that its case was subject to dismissal and Defendant's counterclaim entitled to default judgment. On several occasions, the Court warned both Plaintiff and its counsel that further delays could result in sanctions, including dismissal or default judgment. (*See* Dkt. 43, 84). Most recently, after dismissing the complaint for lack of prosecution, the Court gave Plaintiff a "a *final* opportunity to *fully* respond" to discovery or risk further sanctions. (Dkt. 122 at 10).

Finally, Plaintiff's conduct has abused the judicial process. *See Chambers*, 501 U.S. at 43–45 (the court's inherent power includes "the ability to fashion an appropriate sanction for conduct which abuses the judicial process"). Plaintiff has wasted the Court's time and clogged the Court's calendar. Not only has Plaintiff and its counsel missed numerous deadlines—both in this Court and in the Seventh Circuit—but Plaintiff's requests for extensions are often untimely. Plaintiff has failed to file important briefs, despite explicit orders to do so. For instance, despite being granted two extensions, Plaintiff filed to respond to Defendant's Motion for Voluntary Dismissal for Failure to Prosecute, for Sanctions, and Other Relief. (Dkt. 84, 85, 87, 89, 91). And Plaintiff failed to respond to Defendant's Motion for Reconsideration, despite being granted an extension. (Dkt. 97, 99, 115, 117). Moreover, the Court has conducted numerous status hearings attempting to gain Plaintiff's compliance with its discovery obligations only to listen to Plaintiff's excuses for why it could not meet the Court's deadlines and schedules.

### 3. *Default Judgment is the Appropriate Sanction for Plaintiff's Conduct*

The Court is left with no choice but to sanction Plaintiff's conduct by entering default judgment in favor of Defendant on Defendant's Counterclaim. The Court finds that no lesser sanction would be effective at addressing Plaintiff's flagrant disregard of its discovery obligations and Court orders. *See Domanus v. Lewicki*, 288 F.R.D. 416, 419 (N.D. Ill. 2013) ("Litigants who abuse the judicial process, for example by flouting court orders and ignoring lesser sanctions, should not be surprised to find themselves facing a default judgment."). When the Court dismissed

Plaintiff's case for failure to prosecute, it declined Defendant's request for default judgment, allowing Plaintiff a *final* opportunity to *fully* respond to the outstanding discovery requests. Nevertheless, Plaintiff continued to flaunt Court-ordered deadlines. And, despite the Court's clear instructions, Plaintiff's untimely responses were woefully deficient.

## C. Damages

A default judgment establishes, as a matter of law, that Plaintiff is liable to Defendant on each cause of action alleged in the Counterclaim. *e360 Insight v. The Spamhouse Project*, 500 F.3d 594, 602 (7th Cir. 2007). "Upon default, the well-pled allegations of the complaint relating to liability are taken as true, but those relating to the amount of damages suffered ordinarily are not." *Wehrs v. Wells*, 688 F.3d 886, 892 (7th Cir. 2012); *see* Charles Alan Wright, *et al.*, *Federal Practice and Procedure* § 2688, at 58–59 (3d ed. 1998) ("If the court determines that defendant is in default, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true."). While liability is established, Plaintiff is liable only for those damages that arise from the acts and injuries pleaded in the Counterclaim. *Wehrs*, 688 F.3d at 892 (citation omitted); see T*rans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 70 (2d Cir. 1971), *rev'd on other grounds*, 409 U.S. 363 (1973) ("The outer bounds of the recovery allowable are of course measured by the principle of proximate cause. The default judgment did not give TWA a blank check to recover from Toolco any losses it had ever suffered from whatever source."). Nevertheless, if Plaintiff's conduct makes it difficult for Defendant to prove the precise extent

of its damages, the Court will give Defendant broad latitude in quantifying damages. *BCS Services, Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 759 (7th Cir. 2011).

Additional evidence and information is needed before the Court can rule on the question of damages in this case. By separate order, the Court will set a status hearing, at which time the parties shall be prepared to discuss an appropriate procedure for addressing damages and other relief, including whether a settlement conference on the issue of damages would be helpful.

### III. CONCLUSION

For the reasons described above, Defendant's Motion for Default Judgment [135] is GRANTED in part.

E N T E R:

Dated: July 1, 2013

_____
MARY M. ROWLAND
United States Magistrate Judge